

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. **08 - 22414**
**MC -UNA**

FILED by _____ D.C.

AUG 2 9 2008

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

IN THE MATTER OF THE EXTRADITION
OF
TELMO RICARDO HURTADO HURTADO

_____/

**COMPLAINT**
(18 U.S.C. § 3184)

I, William C. White, being duly sworn, depose and state that I am an Assistant United States

Attorney for the Southern District of Florida and act for and on behalf of the Government of Peru

( the "Requesting State") pursuant to the Extradition Treaty between the United States of America

and Peru, entered into force on August 25, 2003 (the "Treaty") with respect to TELMO RICARDO

HURTADO HURTADO ( "HURTADO" or the "Fugitive").

In accordance with Title 18, United States Code, Section 3184, I charge, on information and

belief, as follows:

1.    <u>Foreign charges</u>.  The fugitive is wanted to stand trial in Peru for his involvement in the

massacre of 69 villagers in the Accomarca region of Peru, in violation of Article 152 of the

Peruvian Criminal Code, as well as for the abduction and forced disappearance of a guide recruited

to guide him through Accomarca, in violation of Articles 223 and 320, respectively, of the Peruvian

Criminal Code.

Article 2 of the Treaty defines extraditable offenses as those punishable under the laws of

both Peru and the United States where the term of imprisonment exceeds one year.  Murder is such

an offense.  In the United States, murder is a violation of the criminal laws of all fifty states and the

District of Columbia, as well as the federal criminal code. *See* 18 U.S.C. Section 1111. The Peruvian charge of abduction corresponds to the charge of kidnapping in the United States, and is a violation of the criminal laws of all fifty states and the District of Columbia, as well as the federal criminal code. *See* 18 U.S.C. Section 1201 et seq. The forced disappearance charge in Peru has no direct analog under U.S. law. However, the conduct underlying this charge (shooting at an individual and causing him to fall into a ravine, after which he was never again seen) would support a charge in the state of Florida for Murder in the first degree and second degree. Florida Statutes, Chapter 782, provides, in pertinent part, that the premeditated unlawful killing of a human being is murder in the first degree and constitutes a capital felony. The unlawful killing of a human being when perpetrated by an act imminently dangerous to another and evincing a depraved mind regardless of human life without any premeditated design and effect the death of any particular individual is murder in the second degree and constitutes a felony of the first degree punishable for a term of years not exceeding life.

2.      <u>Foreign arrest warrant</u>. A warrant for the fugitive's arrest on the charges referenced above was issued on May 31, 2005, by the Third Supra-District Criminal Court in Lima, Peru. That warrant remains valid and executable.

3.      <u>Facts underlying foreign charges</u>. On August 14, 1985, HURTADO was in charge of a Peruvian military patrol that went to the Accomarca region of Peru looking for members of a terrorist insurgent group, "Sendero Luminoso" or Shining Path guerrillas. Although his soldiers found no guerrillas or weapons, HURTADO nevertheless ordered his men to round up and assemble the villagers in the area. The soldiers raped some of the women, and on HURTADO's orders, murdered all the villagers they could find. In order to ensure that no survivors remained, HURTADO himself

lobbed a grenade into a house where the greatest number of victims had been forced to assemble. Because the killings occurred in an area comprised of several hamlets, all within a short distance of one another, HURTADO ordered his men to go from house to house looking for, and immediately killing, anyone found alive.

After the massacre, HURTADO ordered his men to cover the deceased and their homes with dried twigs and branches, and to set the village on fire. By his own admission, HURTADO destroyed the village and covered-up his involvement after the massacre "so that it could be presumed that it had been a terrorist attack." HURTADO also "forced" the disappearance of a guide whom the military had recruited to lead the soldiers to the Accomarca region. HURTADO shot the guide, causing him to fall into a ravine. The guide was never seen again.

Following the killings, HURTADO and his men set up camp nearby where they roasted a sheep and celebrated their actions with drink and song. The sixty-two persons killed included the elderly, pregnant women, young children, and babies.

On September 13, 1985, HURTADO went back to the area to make sure that no incriminating evidence of the massacre remained. HURTADO found seven additional "witnesses" and had them murdered.

After the incident came to light, an investigation ensued. HURTADO admitted his participation in the massacre and the disappearance of the guide, as well as to the murder of witnesses that occurred a month later:

> **The captured persons were made to go into a three room house because there were many of them; I ordered the assault group (seven men) under my charge to open fire into the three rooms at the same time and I myself threw a grenade into the middle room, the one with the most people inside, to finish off any possible**

3

> **wounded survivors and destroy the house.**
>
> &ast; &ast; &ast;
>
> **...I made the decision to eliminate [the villagers] because there were too many of them and I could not take them all to Vilcashuaman because the Attorney General of that locality slept [there]...**

Also included in the Request are excerpts from co-defendant statements that are corroborative of HURTADO's version of events.  For example, Corporal Roberto Contreras Matamoros, a soldier under HURTADO's command, described the incident as follows:

> **While we were going down to the [area]...we could see  people moving about in a hurry. When Lieutenant Hurtado saw this, he divided us into two groups to chase them.  We were able to capture some of them while others escaped.  After that we gathered all the people we had captured, [including] men, women, and children...Lieutenant Hurtado ordered for all the captured persons to be taken to a house...then ordered us to start shooting at them.  When we stopped, some of the bodies continued twitching and it was then that the Lieutenant ordered us to leave the house and he threw a grenade inside.  Once we had checked to see that there was no one left alive we covered the bodies with sticks and dry branches...[and] set the house on fire and the house started to burn with the dead bodies inside. After that, we verified that all of the bodies were burned; some of them had been reduced to ashes but in other cases we could still see the bones.  Later, we picked up the spent [shell] cases that remained on the ground and left...**

In 1992, a military tribunal found HURTADO guilty of abuse of authority, and sentenced him to six years in prison.  HURTADO never served any portion of his sentence, however, because in 1995 then-President Alberto Fujimori granted full amnesty to anyone who may have violated human rights in the course of combating the Shining Path guerrillas.  In light of his amnesty, HURTADO continued serving in the Peruvian military.  However, in decisions handed down in 2001 and 2002, the Inter-American court of Human Rights ruled that the amnesty decrees were null and void.  The

4

Peruvian Supreme Court later incorporated those decisions into Peruvian law, and nullified the prior military proceedings against HURTADO. In December of 2002, HURTADO applied for and obtained a six-month visitor visa from the U.S. consulate in Lima. He obtained the visa by providing false information on the visa application. HURTADO then fled to the United States.

The charges for the Accomarca massacre remain active, and HURTADO will be tried on those charges upon his return to Peru.

4.    <u>Fugitive's presence in the United States</u>. HURTADO, who is within jurisdiction of this Court, is currently located at the Federal Correctional Institution, 15801 Southwest 137th Avenue, Miami, Florida 33177.

5.    <u>Fugitive's description</u>.    According to information provided by Peruvian authorities, HURTADO is a hispanic male, born on July 12, 1961, in Callao Province, Peru. He is the bearer of Peruvian national identification no.: 41767766.

6.    <u>Extradition request</u>.  By Diplomatic Note No. 5-3-M/131, dated June 20, 2006,  the Government of Peru requested the provisional arrest and extradition of HURTADO. On May 11, 2007, by Diplomatic Note No. 5-3-M/116, the Embassy of Peru supplemented the Request. Haley D. Collums and Heather K. McShain, attorneys in the Office of the Legal Adviser of the United States Department of State, each provided the Department of Justice with the aforementioned diplomatic notes and papers in support of the request for extradition. The documents in support of extradition are properly certified by the principal American diplomatic or consular officer in Peru in accordance with Article 7(2)(a) of the Treaty and 18 U.S.C. § 3190, so as to enable them to be received in evidence.

WHEREUPON, YOUR COMPLAINANT REQUESTS:

a. that a warrant be issued for the arrest of TELMO RICARDO HURTADO HURTADO in accordance with Title 18, United States Code, Section 3184, and the Extradition Treaty between the United States of America and Peru;

b. that HURTADO be brought before this Court and the evidence of criminality be heard;

c. that if, on such hearing, the Court deems the evidence sufficient under the provisions of the Treaty to sustain the charges, the Court certify the same to the Secretary of State in order that a warrant may be issued for the surrender of HURTADO to the appropriate authorities of the Requesting State according to the Treaty; and

d. that this Court take such other actions as may be required under the provisions of the Treaty and the laws of the United States to meet the obligations of the United States under the Treaty, including the seizure of any items or materials in HURTADO's possession at the time of apprehension which are related to the crimes charged or which may be used as evidence, pursuant to Article XII of the Treaty.

WHEREFORE, the undersigned requests that the Court find the fugitive extraditable and certify the same to the Secretary of State pursuant to the Treaty and 18 U.S.C. § 3184.

WILLIAM C. WHITE
ASSISTANT UNITED STATES ATTORNEY

Sworn to before me and subscribed in my presence this 29 day of August, 2008, at Miami, Florida, AND A WARRANT SHALL ISSUE.

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

cc:   William C. White, AUSA
      U.S. Marshal Service

7

| 107TH CONGRESS | SENATE | TREATY DOC. |
|---|---|---|
| 2d Session | | 107–6 |

EXTRADITION TREATY WITH PERU

———————

MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMER-
ICA AND THE REPUBLIC OF PERU, SIGNED AT LIMA ON JULY
26, 2001



MAY 8, 2002.—Treaty was read the first time, and together with the
accompanying papers, referred to the Committee on Foreign Relations
and ordered to be printed for the use of the Senate

———————

U.S. GOVERNMENT PRINTING OFFICE

99–118                    WASHINGTON : 2002

# LETTER OF TRANSMITTAL

———

THE WHITE HOUSE, *May 8, 2002.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Extradition Treaty Between the United States of America and the Republic of Peru, signed at Lima on July 26, 2001.

In addition, I transmit for the information of the Senate, the report of the Department of State with respect to the Treaty. As the report explains, the Treaty will not require implementing legislation.

The provisions in this Treaty follow generally the form and content of modern extradition treaties recently concluded by the United States and will replace the outdated extradition treaty in force between the two countries signed in 1899. The Treaty will, upon entry into force, enhance cooperation between the law enforcement communities of the two countries. It will make a significant contribution to international law enforcement efforts against serious offenses, including terrorism, organized crime, and drug-trafficking.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

GEORGE W. BUSH.

(III)

## LETTER OF SUBMITTAL

————

APRIL 20, 2002.

THE PRESIDENT: I have the honor to submit to you the Extradition Treaty Between the United States of America and the Republic of Peru, signed at Lima on July 26, 2001. Upon its entry into force, the Treaty would replace the outdated extradition treaty now in force between the two countries that was signed in 1899. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty follows generally the form and content of other extradition treaties recently concluded by the United States. The Treaty represents a major step forward in U.S. efforts to strengthen cooperation with countries in the region in combating terrorism, organized crime, drug trafficking and other offenses. It is an important part of a concerted effort by the Department of State and the Department of Justice to modernize the legal tools available for the extradition of serious offenders.

The Treaty is designed to be self-executing and will not require implementing legislation.

Article I obligates each Contracting State to extradite to the other, pursuant to the provisions of the Treaty, persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for an extraditable offense.

Article II concerns extraditable offenses. Article II(1) defines an extraditable offense as one punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty. Use of such a "dual criminality" clause rather than a list of offenses covered by the Treaty, as in the 1899 extradition treaty, obviates the need to renegotiate or supplement the Treaty as additional offenses become punishable under the laws in both Contracting States.

Article II(2) defines an extraditable offense further as including an attempt or conspiracy to commit, or association or participation in the commission of, an offense described in paragraph 1.

Additional flexibility is provided by Article II(3), which provides that an offense shall be an extraditable offense regardless of (a) whether the laws in the Contracting States place the offense within a different category of offenses or describe the offense by different terminology, so long as the underlying conduct is criminal in both States; (b) whether the offense is one for which the laws of the Requesting State require the showing of such matters as interstate transportation, or use of the mails or other facilities affecting interstate or foreign commerce for the purpose of establishing jurisdiction of its courts; or (c) where the offense was committed.

VI

Finally, Article II(4) provides that if extradition is granted for one or more extraditable offenses, it shall also be granted for any other offense specified in the request even if that offense does not meet the minimum penalty requirement, provided that all other extradition requirements are met.

Article III provides that extradition shall not be refused on the ground that the person sought is a national of the Requested State.

Article IV sets forth bases for the denial of extradition. Paragraph 1 bars extradition: (a) if the person sought has been tried and convicted or acquitted in the Requested State for the same offense (but does not preclude extradition if the competent authorities in the Requested State have decided not to prosecute such person for the same acts or have decided to discontinue criminal proceedings against the person for those acts); or (b) if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requested State.

As customary in extradition treaties, Article IV(2) provides that extradition shall not be granted if the offense for which extradition is requested constitutes a political offense. It also specifies the following specific categories of offenses that are not to be considered political offenses: (a) a murder or other violent crime against a Head of State of one of the Contracting States, or a member of a Head of State's family; (b) genocide, as described in the Convention on the Prevention and Punishment of the Crime of Genocide, done at Paris on December 9, 1948; (c) an offense for which both Contracting States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution, including but not limited to illicit drug trafficking and related offenses, as described in the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, done at Vienna on December 20, 1988; and offenses related to terrorism, as set forth in multilateral international agreements to which both Contracting States are parties (e.g., the Convention for the Suppression of Unlawful Seizure of Aircraft, done at The Hague on December 16, 1970); and (d) an attempt or conspiracy to commit, or association or participation in the commission of, any of the foregoing offenses.

Article IV(3) requires that extradition not be granted if the executive authority of the Requested State determines that the request was politically motivated.

Article IV(4) provides that the executive authority of the Requested State may also refuse extradition for offenses under military law which are not offenses under ordinary criminal law (e.g., desertion).

Finally, under Article IV(5), the executive authority of the Requested State may refuse extradition if the person sought would be tried, or punished as the result of a trial, under extraordinary criminal laws or procedures in the Requesting State. This provision was included in the Treaty at the instance of the U.S. delegation in response to concerns over due process before special terrorism tribunals in Peru. Under this paragraph, the executive authority of the Requested State would have discretion to deny extradition if the person sought would be or has been tried in a special terrorism

VII

tribunal and there were no procedures in place to safeguard the due process rights of the accused.

Article V concerns capital punishment. Under Article V, when an offense for which extradition is sought is punishable by death under the laws in the Requesting State but not under the laws in the Requested State, the executive authority of the Requested State may refuse extradition unless the Requesting State provides an assurance that the person sought will not be executed. The United States has agreed to similar formulations in other modern extradition treaties (e.g., those with Argentina, the Republic of Korea and India). In cases in which such an assurance is provided, the death penalty shall not be carried out, even if imposed by the courts in the Requesting State. Article V(2) provides further that, except in instances in which the death penalty applies, extradition shall not be refused, nor conditions imposed, on the basis that the penalty for the offense is greater in the Requesting State than in the Requested State.

Article VI establishes the procedures and describes the documents that are required to support a request for extradition. All requests for extradition must be submitted through the diplomatic channel. Among other requirements, Article VI(3) provides that a request for the extradition of a person sought for prosecution must be supported by such evidence as would be sufficient to justify committal for trial of the person if the offense had been committed in the Requested State. Under Article VI(5), if the Requested State requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information shall be submitted to it within such time as that State shall require.

Article VII requires that all documents submitted by the Requesting State be accompanied by a translation into the language of the Requested State and establishes the procedures under which such documents shall be received and admitted as evidence in the Requested State.

Article VIII sets forth procedures and describes the information that is required for the provisional arrest and detention of the person sought, in case of urgency, pending presentation of the formal request for extradition. In particular, Article VIII(4) provides that if the Requested State's executive authority has not received the extradition request and supporting documents required by Article VI within sixty days from the date of the provisional arrest, the person may be discharged from custody. Article VIII(5) explicitly provides that such a discharge from custody shall not be an obstacle to the person's re-arrest and extradition if the formal extradition request is received later.

Article IX specifies the procedures governing a decision on the extradition request and the surrender of the person sought. It requires the Requested State to process the extradition request in accordance with the procedures set forth in its law and the Treaty, and to promptly notify the Requesting State, through the diplomatic channel, of its decision regarding a request. If extradition is granted, the Contracting States shall agree on the time and place for the surrender of the person sought. If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, if any, the person may

VIII

be discharged from custody and the Requested State may thereafter refuse extradition for the same offense. Article IX also provides that if unforeseen circumstances prevent the surrender of the person sought, the States shall agree on a new date, consistent with the laws of the Requested State. If the request is denied in whole or in part, Article IX(4) requires the Requested State to provide an explanation of the reasons for the denial and, upon request, copies of pertinent decisions.

Article X addresses deferred and temporary surrender. Under Article X(1) if a person whose extradition is sought is being prosecuted or is serving a sentence in the Requested State, that State may postpone the extradition proceedings against, or the surrender of, that person until its prosecution has been concluded or the sentence has been served. Alternatively, Article X(2) provides that in such circumstances the Requested State may, in exceptional cases, temporarily surrender the person to the Requesting State exclusively for the purpose of prosecution. The person so surrendered is to be kept in custody in the Requesting State and returned to the Requested State after the conclusion of the proceedings against that person, on conditions agreed between the Contracting States.

Article XI provides a non-exclusive list of factors to be considered by the executive authority of the Requested State in determining to which State to surrender a person whose extradition is sought by more than one State.

Article XII provides that the Requested State may, to the extent permitted under its law, seize and surrender to the Requesting State all articles, documents and evidence connected with the offense for which extradition is granted. Such items may be surrendered even if the extradition cannot be carried out due to the death, disappearance, or escape of the person sought. Surrender of such items may be deferred for such time as is deemed necessary for an investigation or proceeding in the Requested State or may be made on condition that they be returned to the Requested State as soon as practicable. Article XII(3) provides that the rights of the Requested State or of third parties in such items must be duly respected.

Article XIII sets forth the rule of specialty under international law. Paragraph 1 provides, subject to specific exceptions set forth in paragraph 3, that a person extradited under the Treaty may not be detained, tried or punished in the Requesting State except for any offense (a) for which extradition was granted, or a differently denominated offense based on the same facts as the offense for which extradition was granted, provided such offense is extraditable, or is a lesser included offense; (b) committed after the extradition of the person; or (c) for which the executive authority of the Requested State consents to the person's detention, trial or punishment. Article XIII (2) provides that a person extradited under the Treaty may not be extradited to a third State for an offense committed prior to surrender unless the surrendering State consents. Under paragraph 3, these restrictions do not apply if the person has left the jurisdiction of the State to which surrendered and voluntarily returned or has had the opportunity to leave and has not done so within ten days.

IX

Article XIV permits surrender without further proceedings if the person sought consents to be surrendered.

Article XV governs the transit through the territory of one Contracting State of a person being surrendered to the other Contracting State by a third country.

Article XVI contains provisions on representation and expenses that are similar to those found in other modern U.S. extradition treaties. Specifically, the Requested State is required to advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in any proceedings arising out of a request for extradition. The Requested State also bears all expenses incurred in that State by reason of the extradition proceedings, except that the Requesting State pays expenses related to translation of documents and the transportation to the Requesting State of the person sought. Article XVI (3) specifies that neither Contracting State shall make any pecuniary claim against the other arising out of the arrest, detention, custody, examination, or surrender of persons under the Treaty.

Article XVII provides that the U.S. Department of Justice and the Peruvian Ministry of Justice may consult with each other directly in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of the Treaty.

Article XVIII, like the parallel provisions in almost all recent U.S. extradition treaties, makes the Treaty applicable to extradition requests pending on the date of its entry into force and to subsequent extradition requests, even if the crimes were committed prior to the date of entry into force, so long as they constituted offenses under the laws in both Contracting States at the time of their commission.

Article XIX contains final clauses dealing with the Treaty's entry into force and termination. It provides that the Treaty is subject to ratification and that the Treaty shall enter into force upon the exchange of instruments of ratification, which is to take place as soon as possible. Either State may terminate the Treaty with six months written notice to the other State. Article XIX (2) provides that, upon entry into force of the Treaty, the Treaty on Extradition Between the United States of America and the Republic of Peru, signed at Lima November 28, 1899, and the related agreement of February 15, 1990, done at Cartagena, Colombia, shall become null and void.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the U.S. negotiating delegation, consisting of representatives from the Departments of State and Justice, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate at the earliest possible date.

Respectfully submitted,

COLIN L. POWELL.

EXTRADITION TREATY

BETWEEN

THE UNITED STATES OF AMERICA

AND

THE REPUBLIC OF PERU

(1)

2

2

The United States of America and the Republic of Peru (hereinafter also, the "Contracting States"),

Recalling the Treaty on Extradition Between the United States of America and the Republic of Peru, signed at Lima November 28, 1899, and related agreement of February 15, 1990, done at Cartagena, Colombia;

Desiring to enhance cooperation between the two States in the suppression of crime;

Have agreed as follows:

3

3

## Article I

### Obligation to Extradite

The Contracting States agree to extradite to each other, pursuant to the provisions of this Treaty, persons whom the authorities in the Requesting State have charged with, found guilty of, or sentenced for, the commission of an extraditable offense.

## Article II

### Extraditable Offenses

1.      An offense shall be an extraditable offense if it is punishable under the laws in both Contracting States by deprivation of liberty for a maximum period of more than one year or by a more severe penalty.

2.      An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, or association or participation in the commission of, any offense described in paragraph 1.

3.      For the purposes of this Article, an offense shall be an extraditable offense, regardless of:

(a)      whether the laws in the Contracting States place the offense within a different category of offenses or describe the offense by different terminology, so long as the underlying conduct is criminal in both States;

(b)      whether the offense is one for which the laws of the Requesting State require, for the purpose of establishing jurisdiction of its courts, evidence of interstate transportation, or the use of the mails or other facilities affecting interstate or foreign commerce, as elements of the specific offense;  or

(c)      where the offense was committed.

4.      If extradition has been granted for one or more extraditable offenses, it shall also be granted for any other offense specified in the request even if the latter offense is punishable by one year or less of deprivation of liberty, provided that all other requirements for extradition are met.

4

4

## Article III

### Extradition of Nationals

Extradition shall not be refused on the ground that the person sought is a national of the Requested State.

## Article IV

### Bases for Denial of Extradition

1.    Extradition shall not be granted:

(a)    if the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested. However, extradition shall not be precluded by the fact that the authorities in the Requested State have decided not to prosecute the person sought for the same acts for which extradition is requested, or to discontinue any criminal proceedings that have been instituted against the person sought for those acts; or

(b)    if prosecution of the offense or execution of the penalty is barred by lapse of time under the laws of the Requesting State.

2.    Extradition shall not be granted if the offense for which extradition is requested constitutes a political offense. For the purposes of this Treaty, the following offenses shall not be considered to be political offenses:

(a)    a murder or other violent crime against the person of a Head of State of one of the Contracting States, or of a member of the Head of State's family;

(b)    genocide, as described in the Convention on the Prevention and Punishment of the Crime of Genocide, done at Paris on December 9, 1948;

(c)    an offense for which both Contracting States have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution, including, but not limited to:

(i)    illicit drug trafficking and related offenses, as described in the United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, done at Vienna on December 20, 1988;  and

(ii)    offenses related to terrorism, as set forth in multilateral international agreements to which both Contracting States are parties; and

5

ς

3.     Extradition shall not be granted if the executive authority of the Requested State determines that the request was politically motivated.

4.     The executive authority of the Requested State may refuse extradition for offenses under military law which are not offenses under ordinary criminal law.

5.     The executive authority of the Requested State may refuse extradition if the person sought would be tried, or punished as the result of a trial, under extraordinary criminal laws or procedures in the Requesting State.

Article V

Death Penalty

1.     When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority of the Requested State may refuse extradition unless the Requesting State provides an assurance that the person sought will not be executed.  In cases in which such an assurance is provided, the death penalty shall not be carried out, even if imposed by the courts in the Requesting State.

2.     Except in instances in which the death penalty applies, extradition shall not be refused, nor conditions imposed, on the basis that the penalty for the offense is greater in the Requesting State than in the Requested State.

Article VI

Extradition Procedures and Required Documents

1.     All requests for extradition shall be made in writing and submitted through the diplomatic channel.

2.     All requests for extradition shall be supported by:

(a)     documents, statements, or other types of information that describe the identity and probable location of the person sought;

(b)     information describing the facts of the offense and the procedural history of the case;

(c)     the text of the laws describing the essential elements of, and the applicable punishment for, the offense for which extradition is requested;

(d)     the text of the laws indicating that neither the prosecution nor the execution of the penalty are barred by lapse of time in the Requesting State;  and

(e)     the documents, statements, or other types of information specified in paragraph 3 or paragraph 4 of this Article, as applicable.

6

6

3.      A request for extradition of a person who is sought for prosecution shall also be supported by:

(a)      a copy of the warrant or order of arrest issued by a judge or other competent authority;

(b)      a copy of the charging document; and

(c)      such evidence as would be sufficient to justify the committal for trial of the person if the offense had been committed in the Requested State.

4.      A request for extradition relating to a person who has been found guilty of, or sentenced for, the offense for which extradition is sought shall also be supported by:

(a)      a copy of the judgment of conviction or, if such copy is not available, a statement by a competent judicial authority that the person has been found guilty;

(b)      evidence or information establishing that the person sought is the person to whom the finding of guilt refers; and

(c)      a copy of the sentence imposed, if the person sought has been sentenced, and, if applicable, a statement establishing to what extent the sentence has been carried out.

5.      If the Requested State requires additional evidence or information to enable it to decide on the request for extradition, such evidence or information shall be submitted to it within such time as that State shall require.

Article VII

Translation and Admissibility of Documents

1.      All documents submitted by the Requesting State shall be accompanied by a translation into the language of the Requested State.

2.      The documents that accompany an extradition request shall be admitted as evidence in extradition proceedings if:

(a)      the documents are certified or authenticated by the appropriate accredited diplomatic or consular officer of the Requested State in the Requesting State; or

(b)      the documents are certified or authenticated in any other manner accepted by the laws in the Requested State.

7

7

## Article VIII

### Provisional Arrest

1.    In case of urgency, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition. A request for provisional arrest shall be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the Republic of Peru.

2.    The application for provisional arrest shall contain:

(a)    a description of the person sought;

(b)    the location of the person sought, if known;

(c)    a brief statement of the relevant facts of the case, including, if possible, the time and location of the offense;

(d)    a description of the law or laws violated;

(e)    a statement of the existence of a warrant of arrest, or of a finding of guilt or judgment of conviction, against the person sought; and

(f)    a statement that a request for extradition for the person sought will follow.

3.    The Requesting State shall be notified without delay of the disposition of its application for provisional arrest and the reasons for any denial of such application.

4.    A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the request for extradition and the supporting documents required in Article VI.

5.    The discharge from custody of the person sought pursuant to paragraph 4 of this Article shall not be an obstacle to the rearrest and extradition of that person if the extradition request is received later.

8

8

### Article IX

#### Decision on the Extradition Request and Surrender of the Person Sought

1.    The Requested State shall process the request for extradition in accordance with the procedures set forth in its law and this Treaty, and shall promptly notify the Requesting State, through the diplomatic channel, of its decision regarding such request.

2.    If extradition is granted, the Contracting States shall agree on the time and place for the surrender of the person sought. If that person is not removed from the territory of the Requested State within the time prescribed by the law of that State, if any, that person may be discharged from custody, and the Requested State may thereafter refuse extradition for the same offense.

3.    If unforeseen circumstances prevent the surrender of the person sought, the affected Contracting State shall inform the other State, and such States shall agree on a new date for the surrender, consistent with the laws of the Requested State.

4.    If the request is denied in whole or in part, the Requested State shall provide an explanation of the reasons for the denial and, upon request, shall provide copies of pertinent decisions.

### Article X

#### Deferred and Temporary Surrender

1.    The Requested State may postpone the extradition proceedings against, or the surrender of, a person who is being prosecuted or who is serving a sentence in that State. The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed. The Requested State shall notify the Requesting State as soon as possible of any postponement pursuant to this paragraph.

2.    If extradition is granted in the case of a person who is being proceeded against or is serving a sentence in the Requested State, such State may, in exceptional cases, temporarily surrender the person sought to the Requesting State exclusively for the purpose of prosecution. The person so surrendered shall be kept in custody in the Requesting State and shall be returned to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by agreement of the Contracting States.

9

9

### Article XI

### Concurrent Requests

If the Requested State receives requests from the other Contracting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State it will surrender the person. In making its decision, the Requested State shall consider all relevant factors, including the following:

(a)   whether the requests were made pursuant to treaty;

(b)   the place where each offense was committed;

(c)   the respective interests of the requesting States;

(d)   the gravity of each offense;

(e)   the possibility of further extradition between the requesting States; and

(f)   the chronological order in which the requests were received by the Requested State.

### Article XII

### Seizure and Surrender of Property

1.   To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all articles, documents, and evidence connected with the offense for which extradition is granted. The items mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2.   The Requested State may defer the surrender of the items described in paragraph 1 of this Article for such time as it is deemed necessary for an investigation or proceeding in that State. The Requested State may also surrender such items on condition that they be returned to that State as soon as practicable.

3.   The rights of the Requested State or of third parties in such items shall be duly respected.

10

10

### Article XIII

### Rule of Speciality

1.    A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a)    an offense for which extradition was granted, or a differently denominated offense, provided that such differently denominated offense:

(i)    is based on the same facts on which extradition was granted, and would itself be an extraditable offense; or

(ii)    is a lesser included offense of an offense for which extradition was granted;

(b)    an offense committed after the extradition of the person; or

(c)    an offense for which the executive authority of the Requested State consents to the person's detention, trial, or punishment. For the purpose of this subparagraph:

(i)    the Requested State may require the submission of the documents specified in Article VI; and

(ii)    the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request is being processed.

2.    A person extradited under this Treaty may not be extradited to a third State for an offense committed prior to such person's surrender unless the surrendering State consents.

3.    Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the subsequent extradition of that person to a third State, if that person:

(a)    leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

(b)    does not leave the territory of the Requesting State within 10 days of the day on which that person is free to leave.

11

11

## Article XIV

### Simplified Procedure for Surrender

If the person sought consents to surrender to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

## Article XV

### Transit

1.      Either Contracting State may authorize, upon request of the other Contracting State, transit through its territory of a person surrendered to such other State by a third State. A request for transit shall be transmitted through the diplomatic channel or directly between the United States Department of Justice and the Ministry of Justice of the Republic of Peru. Such request shall contain a description and identification of the person being transported and a brief statement of the facts of the case. A person in transit may be detained in custody during the period of transit.

2.      No authorization shall be required if one Contracting State is transporting a person surrendered to it by a third State using air transportation and no landing is scheduled on the territory of the other Contracting State. If an unscheduled landing occurs on the territory of a Contracting State, that State may require a transit request as provided in paragraph 1 of this Article. If required, any such request shall be provided within ninety-six (96) hours of the unscheduled landing. The Contracting State in which the unscheduled landing occurs may detain the person to be transported until the transit is effected.

## Article XVI

### Representation and Expenses

1.      The Requested State shall advise, assist, appear in court on behalf of, and represent the interests of the Requesting State in any proceedings arising out of a request for extradition.

2.      The Requesting State shall bear the expenses related to the translation of documents and the transportation to that State of the person sought. The Requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

3.      Neither Contracting State shall make any pecuniary claim against the other State arising out of the arrest, detention, custody, examination, or surrender of persons sought under this Treaty.

12

12

Article XVII

Consultation

The United States Department of Justice and the Ministry of Justice of the Republic of Peru may consult with each other directly in connection with the processing of individual cases and in furtherance of maintaining and improving procedures for the implementation of this Treaty.

Article XVIII

Application

The provisions of this Treaty shall apply from the date of its entry into force:

(a)    to pending extradition requests for which a final decision has not yet been rendered; and

(b)    to extradition requests initiated subsequent to such entry into force, even if the crimes were committed prior to that date, provided that at the time of their commission they constituted offenses under the laws in both Contracting States.

13

13

Article XIX

Final Clauses

1.     This Treaty shall be subject to ratification, and will enter into force upon exchange of the instruments of ratification.  The instruments of ratification shall be exchanged as soon as possible.

2.     Upon the entry into force of this Treaty, the Treaty on Extradition Between the United States of America and the Republic of Peru, signed at Lima November 28, 1899, and related agreement of February 15, 1990, done at Cartagena, Colombia, shall become null and void.

3.     Either Contracting State may terminate this Treaty when it deems such action appropriate by giving written notice thereof to the other Contracting State.  The termination shall be effective six months after the date of such notice.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective governments, have signed this Treaty.

DONE in duplicate, at Lima, in the English and the Spanish languages, both texts being equally authentic, this 26ᵗʰ day of  *July*      , 2001.

FOR THE  UNITED STATES                          FOR THE REPUBLIC
OF AMERICA:                                             OF PERU:

*[signature]*                                                   *[signature]*

O

08-22414

%JS 44   (Rev. 11/04)

# CIVIL COVER SHEET

MC - UNA

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| **I. (a)   PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| UNITED STATES OF AMERICA | IN RE:   IN THE MATTER OF THE EXTRADITION OF TELMO RICARDO HURTADO HURTADO |

**(b)**   County of Residence of First Listed Plaintiff _____
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

FILED by ___ D.C.
INTAKE

AUG 2 9 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. MIAMI

**(c)**   Attorney's (Firm Name, Address, and Telephone Number)

William C. White, AUSA
99 NE 4th Street
Miami, Florida 33132
Telephone No. (305) 961-9451

Attorneys (If Known)

**(d)** Check County Where Action Arose:   ☒ DADE   ☐ MONROE   ☐ BROWARD   ☐ PALM BEACH   ☐ MARTIN   ☐ ST. LUCIE   ☐ INDIAN RIVER   ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

Miami CFM 58414

☒ 1   U.S. Government Plaintiff

☐ 3   Federal Question
(U.S. Government Not a Party)

☐ 2   U.S. Government Defendant

☐ 4   Diversity
(Indicate Citizenship of Parties in Item III)

Lenard / Garber

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN   (Place an "X" in One Box Only)

☒ 1   Original Proceeding
☐ 2   Removed from State Court
☐ 3   Remanded from Appellate Court
☐ 4   Reinstated or Reopened
☐ 5   Transferred from another district (specify)
☐ 6   Multidistrict Litigation
☐ 7   Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE   Joan A. Lenard   DOCKET NUMBER   07-20233-CR-JAL

DATE   8/29/08   SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____